**E-FILED**
Wednesday, 06 June, 2007 02:59:18 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

PAMELA SWISHER,            )
                          )
    Plaintiff,        )       No. 05-1174
                          )
v.                        )
                          )
HINSHAW & CULBERTSON,      )
                          )
    Defendant.        )

## O P I N I O N   A N D   O R D E R

Before the Court is Defendant's Motion for Summary Judgment filed on October 17, 2006. [Doc. 11.] Plaintiff filed a Response on November 21, 2006 [Doc. 13] and Defendant filed a Reply on December 5, 2006 [Doc. 16]. For the following reasons, Defendant's Motion for Summary Judgment is GRANTED.

### I.
#### BACKGROUND

Plaintiff, Pamela Swisher, alleges that she was the victim of employment discrimination while employed in the Peoria office of Defendant, the law firm of Hinshaw & Culbertson.

Plaintiff began her employment with Defendant in 1997 as an office coordinator. (Doc. 13 at ¶ 29.) At that time, she reported to Paul Estes, one of Defendant's capital partners. (Doc. 11 at ¶ 5, Doc. 13 at 3.) The two other capital partners in the Peoria office were Doug Marshall and Dave Jones.

Together, Estes, Marshall and Jones had the most authority in the Peoria office to make employment decisions. (Doc. 13 at ¶ 5.) Although Estes was the managing partner, the impression given by Plaintiff is that Jones was influential because he brought in and serviced State Farm Insurance Company, the firm's largest and most lucrative client. (Doc. 13 at ¶¶ 5-9.)

The focus of Plaintiff's claim is on her relationship with Jones and this Court accepts her view of that relationship as the Court is required to do at this stage of litigation. When Plaintiff first began her employment with Defendant in 1997, Plaintiff and Jones had a professional and mutually supporting relationship and Jones had never disciplined Plaintiff. (Doc. 11 at ¶ 25; Doc. 13 at 3.) Then, in September of 1998, Plaintiff was invited with other office employees on an outing on Jones' sailboat. (Doc. 13 at ¶ 48.) After the outing, when Jones' sailboat returned to the dock on Main Street in Peoria, he excused everyone except Plaintiff because he wanted her help to take the boat back to the marina. (Doc. 13 at ¶ 49.) Because Jones had been trying to get Plaintiff out on his boat for some time Plaintiff viewed this as a pretext to get the two of them alone.

Once they were alone, Jones made sexual advances toward Plaintiff. Specifically, Jones placed his hand on Plaintiff's leg and told her that she had the sexiest voice that he had ever

heard.  (Doc. 13 at ¶ 50-51.)  Plaintiff then attempted to distance herself from Jones.  (Doc. 13 at ¶ 50.)  However, Jones continued to inquire about who she was dating and grabbed her knee and held it briefly.  (Doc. 13 at ¶ 50.)  After that, Plaintiff informed Jones that she was in a serious relationship. (Doc. 13 at ¶ 50.)  Jones continued to raise personal subjects with Plaintiff and Plaintiff continued to change the subject. When Plaintiff kept changing the topic of conversation, Jones became angry (Doc. 13 at ¶ 52) but made no further advances toward her (Doc. 11 at ¶ 22, Doc. 12 at 4).

According to the Complaint (Doc. 1), once Plaintiff made clear through her actions that she was not interested in a sexual relationship, Jones began to treat her differently. (Doc. 1 at ¶ 10.)  That evening after Plaintiff and Jones drove away from the marina, Jones would not speak to Plaintiff.  (Doc. 13 at ¶ 53.)  From that point until the spring of 1999, (Doc. 11 at Ex. 5 p. 102) Jones' attitude toward her completely changed at work.  Specifically, Plaintiff alleges that Jones would openly criticize her in front of other staff members by calling her stupid and inept (Doc. 13 at ¶ 58), at least once he ignored her for weeks (Doc. 13 at ¶ 58; Doc. 16 at p. 6), and he would be rude and intimidating toward individuals that reported directly to Plaintiff.  Jones could have a short temper, be aggressive, or have conflicts with other people in the office.

3

(Plaintiff's Dep. at 98-99; Doc. 13 at 27; Marshall Dep. at 67-70.)  However, his conflict with Plaintiff and those who reported to her was more intense than his conflicts with other people in the office.  (Marshall Dep. at 67-70.)  As an example, Plaintiff notes that on one occasion Jones referred to an African-American and a Hispanic clerk who reported to Plaintiff as "Pam's trained monkeys."  (Doc. 13 at ¶ 57.)

Sometime early in 1999, Plaintiff made a sexual harassment complaint against Jones.  (Doc. 13 at ¶ 61.)  Initially, she went to Estes and then later spoke to Anne Connor over the phone. (Doc. 11 at ¶ 32-33; Doc. 13 at 3.)  Connor was the director of human resources for the entire firm and her office was located at the firm's headquarters in Chicago.  (Doc. 11 at ¶ 31; Doc. 13 at 3.)  Plaintiff described the incident on the boat and resulting treatment by Jones and informed Connor that she wanted Jones' behavior to stop.  (Doc. 13 at 64; Doc. 11 at Ex. 5 p. 140-145.)

Immediately after this complaint was made, Jones' treatment toward Plaintiff improved for several months.  However, after that period of time, he resumed being openly critical of Plaintiff.  (Doc. 13 at ¶ 66.)  Specifically, Jones would be critical of Plaintiff at meetings, and at one point Jones allegedly became angry with Plaintiff, threw files in the office and directed Plaintiff to pick up the files. (Doc. 13 at ¶ 67.)

4

Finally, Plaintiff alleges that she was told by Mark Flannery,[1] a non-capital partner, that Jones "wanted to find a reason to fire Plaintiff." (Doc. 13 at ¶ 74.) Flannery allegedly told Plaintiff that Jones was mad at her for complaining to Connor. (Id.) However, Plaintiff does not provide a specific date for this occurrence.

Her complaint in early 1999 was the only complaint Plaintiff ever made regarding Jones and his conduct toward her. In July of 1999, Plaintiff received a pay increase. In 2001, Plaintiff was promoted to office manager and received a second pay increase of approximately $6,000 or fifteen percent of her annual salary. (Doc. 11 at ¶ 45-46; Doc. 13 at 3.) Then, in July of 2002, Plaintiff received a third raise of $4,000 or approximately ten percent of her salary. (Doc. 11 at ¶ 48; Doc. 13 at 3.)

According to Defendant, by November of 2002, several members of the firm had expressed frustration regarding Plaintiff. (Doc. 11 at ¶ 78; Doc. 13 at 4.) One non-capital partner complained to Estes concerning tension between Plaintiff

---

[1] Plaintiff also alleges that she "became close to having an intimate sexual relationship" with Flannery. (Doc. 13 at ¶ 72.) However, in Plaintiff's brief, Plaintiff does not tie in the alleged possible relationship with any relevant argument. The Court is left to speculate on what relevance this possible relationship might have to the case except a possible bias by Flannery for or against Plaintiff. Given this uncertainty, the Court will not consider the relationship with Flannery for purposes of this Order.

and other staff members.  (Doc. 11 at ¶ 61; Doc. 13 at 3.)
Another non-capital partner complained about a conflict between
Plaintiff and his secretary.  (Doc. 11 at ¶ 72; Doc. 13 at 4.)
And, a third partner was extremely upset and complained that he
and his secretary had both been told at separate times by
Plaintiff that they did not want to work with each other.  (Doc.
11 at ¶¶ 75-76.)  While Plaintiff acknowledges that partners
complained, Plaintiff denies ever making false statements.
(Doc. 13 at 4.)  In addition, according to Estes, other partners
experienced similar problems with Plaintiff.  (Doc. 13 at ¶ 78;
Doc. 13 at 4.)  For example, two partners told Estes that they
refused to allow Plaintiff to assist them with end of the year
collections due to a lack of trust.  (Doc. 13 at ¶ 77; Doc. 13
at 4.)  According to Defendant, because of these complaints a
meeting was held in November of 2002 to discuss Plaintiff's
performance.

     According to Estes and Marshall, at the November meeting,
Swisher's deficient performance was deliberated.  Members of the
firm discussed examples of situations where Plaintiff was
unreasonably difficult or showed deficient management authority.
(Doc. 11 at ¶ 91; Doc. 13 at 4.)  According to Estes, "Pam had a
tendency to fan flames of fire and that just made a lot of
people uncomfortable in the office."  (Doc. 16 at ¶ 97.)  At the
end of the meeting, the firm decided to terminate Plaintiff

after the first of the year.  (Doc. 11 at ¶ 97.)  On January 10, 2003, Plaintiff was called into a meeting with Connor and Marshall.  (Doc. 13 at ¶¶ 102-103.)  At that meeting, Plaintiff was informed that she was fired.

According to Plaintiff, She was not fired because of the partners complaints at the November meeting.  Instead, Plaintiff argues that her termination had more to do with Angela Nunn, a subordinate employee at the Peoria office.  During the week prior to Plaintiff's termination, Nunn did not show up for work two days in a row.  Plaintiff informed Marshall that Nunn should be fired and Marshall approved the termination.  (Doc. 13 at ¶ 90.)  Jones however did not believe that Nunn should be fired.  (Doc. 13 at ¶ 94.)  Jones ordered a meeting to discuss Nunn's termination and at the meeting Jones screamed and yelled at Plaintiff.  (Doc. 13 at ¶ 93.)  Plaintiff was terminated the next day and believes that the "Angela Nunn incident" provided Jones the cover to terminate her.  To support her argument that the Nunn incident was a pretext for Plaintiff's termination, Plaintiff emphasizes that Nunn was briefly rehired after Plaintiff was terminated only to be "eventually" re-fired.  (Doc. 13 at ¶ 95.)  In particular, Plaintiff points out that Connor told Plaintiff that the incident with Angela Nunn was a contributing factor in Plaintiff's termination.

Plaintiff has now brought a two count Complaint against Defendant under Title VII of the Civil Rights Act of 1964 (the "Act").  In Count I, Plaintiff alleges that she was the victim of gender discrimination in violation of 42 U.S.C. § 2000e-2(a).  In Count II, Plaintiff alleges that she was terminated in retaliation for opposing conduct by Jones which she believed violated the Act contrary to 42 U.S.C. § 2000e-3.  Plaintiff has consented to the dismissal of Court I in her Response (Doc. 13 at n. 1).  Accordingly, the only remaining claim is that Plaintiff was retaliated against for engaging in protected activity under Title VII as alleged in Count II.

## II.
## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

Once the movant has met its burden, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which [s]he bears the burden of proof at trial." Warsco v. Preferred Tech. Group, 258 F.3d 557, 563 (7th Cir. 2001); See also Celotex Corp., 477 U.S. at 322-24. "The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." Chemsource, Inc. v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997).

This Court must nonetheless "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). In doing so, this Court is not "required to draw every conceivable inference from the record -- only those inferences that are reasonable." Bank Leumi Le-Isreal, B.M. v. Lee, 928 F.2nd 232, 236 (7th Cir. 1991). Therefore, if the record before the court "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of material fact exists and, the moving party is entitled to judgment as a matter of law. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). However, in ruling on a motion for summary

judgment, the court may not weigh the evidence or resolve issues
of fact; disputed facts must be left for resolution at trial.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

## III.
## ANALYSIS

Plaintiff has brought her remaining claim under Title VII
of the Civil Rights Act of 1964 as amended.  Specifically
Plaintiff points to 42 U.S.C. § 2000e-3(a) which provides that
"it shall be an unlawful employment practice for an employer to
discriminate against any of his employees . . . because he has
opposed any practice made an unlawful employment practice by
this title . . ., or because he has made a charge, testified,
assisted, or participated in any manner in an investigation,
proceeding or hearing under this title."

In its latest exposition as to the scope of this anti-
retaliation provision, particularly the reach of its phrase
"discriminate against," the Supreme Court held that the
provision "covers those (and only those) employer actions that
would have been materially adverse to a reasonable employee...."
Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct.
2405, 2408-09, ___ U.S. ___ (2006).  The Court further explained
that "in the present context that means that the employer's
actions must be harmful to the point that this could well
dissuade a reasonable worker from making or supporting a charge

of discrimination." Id. at 2409.  However, the Court did not
retreat from the long established view that "... personality
conflicts at work that generate antipathy and snubbing by
supervisors and coworkers are not actionable under [§ 2000e-
3(a)]." Burlington Northern, 126 S.Ct. at 2415 (internal
quotations omitted).

In order to overcome Defendant's Motion for summary
judgment, Plaintiff may establish a *prima facie* case of
retaliation using either the direct method or indirect method.
See Stone v. City of Indianapolis Public Utilities Division, 281
F.3d 640, 644 (7th Cir. 2002); Sylvester v. SOS Children's
Villages Illinois, Inc., 453 F.3d 900 (7th Cir. 2006).  Under
the direct method Plaintiff must present direct evidence[2] of (1)
a statutorily protected activity; (2) an adverse action taken by
the employer; and (3) a causal connection between the two.
Stone, at 644.  Under the indirect method as adapted from the
generic test established in McDonnell Douglas Corp. v. Green,

---

[2] This is "evidence that establishes [a proposition] without
resort to inference from circumstantial evidence." Sylvester, at
902. However, Judge Posner qualified this axiom by pointing out
its misleading nature in practice.  "What is true is that the
direct method does not utilize the specific circumstantial
evidence that the plaintiff presents when he uses the indirect
method of establishing discrimination.  But if he can prove by
means of circumstantial evidence that he engaged in protected
activity (filing a charge of discrimination) and as a result
suffered the adverse employment action of which he complains,
that is fine, as most of our cases, sensibly disregarding the
dictum in *Stone,* properly assume. Id., at 902 (internal
quotations omitted).

411 U.S. 792 (1973), Plaintiff must show that (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  Sitar v. Indiana Dept. of Transportation, 344 F.3d 720, 728 (7th Cir. 2003).  If the Plaintiff establishes these elements, Defendant has the burden to produce a legitimate, nondiscriminatory reason for its actions.  Once this reason is produced, Plaintiff has the burden of proving that the reason is pretextual.  Id.  The direct method is "more onerous" because of the need to show a causal connection between a protected activity and the adverse employment action of which the plaintiff complains; "but it is the plaintiff's only recourse if he (or in this case she) cannot prove that a similarly situated employee who did oppose the employer's practice was not fired or otherwise treated as badly as the plaintiff was."  Slyvester, at 902.

In the case at bar, Plaintiff craftily obscures whether she is proceeding under the direct or indirect method of proving retaliatory discrimination.  Because there appears to be obvious difficulties in showing that similarly situated persons to her were not treated as badly as she was, the Court has taken

Plaintiff at face value that she has opted to use the direct method by showing that Defendant had the intent to retaliate against her because she complained against Jones' conduct toward her.  And, since Plaintiff lacks direct evidence of a retaliatory intent in the conventional sense, Plaintiff seeks to survive summary judgment by showing enough circumstantial evidence that a jury could reasonably conclude that those who fired Plaintiff had a retaliatory intent.

Some earlier decisions of our Circuit Court have allowed a plaintiff to proceed under this ersatz direct method when they have presented a "convincing mosaic of circumstantial evidence." See East-Miller v. Lake County Highway Dept., 421 F.3d 558, 564 (7th Cir. 2005); Troupe v. May Dept. Stores Co., 20 F.3d 734, 737 (7th Cir. 1994).  However, most recently, our Appellate Court has noted that a "convincing mosaic" is not required. Specifically, a plaintiff can proceed under the so-called "'alternative direct method' to direct evidence of establishing the prima facie case" by presenting enough circumstantial evidence that a reasonable jury could conclude that accusations or complaints of sexual harassment were a cause of a plaintiff's termination.  Sylvester, 453 F.3d 900, 903 (7th Cir. 2006).

In Sylvester, our Appellate Court addressed a retaliation claim from a woman who had complained of sexual harassment. Four women, including Plaintiff, signed a letter that had

accused the chief executive officer of a corporation of sexual harassment.  Two of the women, not including the plaintiff, had recent poor job performance issues and the defendant believed that they had signed the letter to stave-off being fired.  There were no current job performance issues with the plaintiff, yet at the directors' meeting discussing the complaint, her past job performance was raised and the CEO was authorized to fire her, not for performing badly, but for her "reacting adversely" to news of the firing of the other two cosignatories of the letter. Id., at 905.  The district court granted summary judgment for the employer on the ground that the plaintiff had failed to make out a prima facie case of retaliation, apparently finding no genuine dispute as to the reason for Plaintiff's termination. The Seventh Circuit disagreed and ruled that a reasonable jury could believe that the plaintiff was fired in retaliation for her complaint, pointing to the following circumstantial evidence:

> "First, the prompt firing of two of the four signatories; it is undisputed that they were poor performers, but, if so, why were they not fired until shortly after they signed the letter accusing West of sexual harassment, an accusation that could get the company into trouble?  Second, as there were no current performance issues with Sylvester, why was her performance brought up at the meeting at which the chairman of the board and the lawyer member, Roth, decided to fire Elstad and Ryan?  And third, why was West authorized at that meeting to fire her not for performing her job badly but for reacting adversely to news of the firing of two of the cosignatories of the

letter?  A reasonable jury might conclude that she was
being set up-that the defendant's officers who met the
night before knew she was sure to be upset by the
firings, and that West was being invited to interpret
that predictable reaction as insubordination.  Putting
together these items of circumstantial evidence, a
reasonable jury could conclude that the accusations of
sexual harassment in the letter signed by Sylvester
were a cause of her being fired.  No more is necessary
to show that she established a prima facie case using
the "direct" method of proof.[3]
Id., at 905.

If indeed the plaintiff's claim in Sylvester was "maybe

barely enough," then because of the temporal gap in the instant

case, Plaintiff's retaliation claim falls well short.  First,

the incident on Jones' boat occurred in 1997, then Plaintiff

complained to Connor and Estes early in 1999, yet she was not

terminated until January of 2003, four years later.  By

contrast, the termination in Sylvester occurred within days of

the actual complaint.

Plaintiff "bears the burden of pointing to some causal link

between any adverse employment action and her protected

expression."  Sweeney v. West, 149 F.3d 550, 557 (7th Cir.

1998).  A "telling temporal sequence" can establish the nexus.

Holland v. Jefferson Nat'l Life Ins. Co., 883 F.2d 1307, 1315

(7th Cir. 1989).  The fact that much time has passed does not

mean that Plaintiff cannot prove that retaliation caused the

---

[3] Noteworthy is Judge Posner's observation that while this
evidence does *not* comprise "a rich mosaic of circumstantial
evidence of retaliation... there is enough (though maybe barely
enough) to preclude summary judgment."  Id. at 904.

discharge; "instead, it means that the timing of her discharge, in itself, does not support an inference of retaliation, and she must come forward with other evidence." Paluck v.Gooding Rubber Co., 221 F.3d 1003, 1010 (7th Cir. 2000). Furthermore, as the period of time separating the protected activity and the adverse employment action lengthens, the suspicion of a causal connection weakens. Davidson v. Midelfort Clinic, 133 F.3d 499, 511 (7th Cir. 1998); See also, Contreras v. Suncast Corp., 237 F.3d 756, 765 (7th Cir. 2001)(26-day gap between complaint of national origin discrimination and discharge insufficient to establish causal connection); Parnell v. Hometown Distributing Co., Inc., 2006 WL 314518, *8 (N.D. Ill. Feb. 7, 2006)(finding 29-day gap insufficient, but finding 3-day gap sufficiently close to merit suspect timing inference so long as additional evidence of a causal connection exists).

Thus, Plaintiff must bring forward enough circumstantial evidence to overcome the weakness in her claim created by the four year gap. Plaintiff argues that there is sufficient other circumstantial evidence that Jones was "waiting in the weeds," lingering for an opportunity to get Plaintiff fired. See Veprinksy v. Fluor Daniel, Inc., 87 F.3d 881, n. 6 (7th Cir. 1996)(noting that a reasonable jury can infer from sufficient circumstantial evidence that an employer waited in the weeds for five or ten years to retaliate). Plaintiff puts forward

circumstantial evidence which, she argues, supports an inference
that Jones waited in the weeds for over four years.  However,
this circumstantial evidence, even when viewed collectively, is
not sufficient to convince a reasonable jury that Plaintiff's
protected activity was a cause of her termination.

First, Plaintiff argues that "Jones was unrelenting in his
conduct." (Doc. 13 at 38.)  This argument has no factual
support in the record that Plaintiff has put before the Court.
When Plaintiff complained, Jones conduct abated for several
months before it resumed. (Doc. 13 at ¶ 66.)  While Jones'
conflict with Plaintiff was particularly intense, Plaintiff
acknowledges that the evidence reflects that Jones, on his own,
was "a difficult person" who had conflicts with other employees.
(Doc. 13 at 38; Plaintiff's Dep. at 98-99; Doc. 13 at 27;
Marshall Dep. at 67-70.)

In addition, the Court notes that Jones is an attorney and
Defendant is a law firm.  A sophisticated party aware of the
laws regarding retaliation is certainly more likely to engage in
more subtle methods of retaliation.  And, waiting in the weeds
for more time to elapse is certainly a method of trying to cover
up ones malicious intent and avoid litigation.  However, if
indeed Jones' goal was to push Plaintiff out of the firm, it is
unlikely that he would have stood idly by for four years while
Plaintiff received three raises and two promotions.

The best way for an employer to avoid employment litigation is for an employee to leave the employer voluntarily.  While Jones may not have been the manager who gave Plaintiff her raises and promotions, if he was bent on pushing her out of the firm, he would have voiced at least some opposition to her multiple upgrades.  After all, those raises and promotions substantially reduced or eliminated any chance that despite Jones rude and uncivil conduct toward her, she would leave the firm voluntarily.  In short, standing idly by while an employee receives multiple raises and promotions over four years is not the act of a vindictive manager bent on retaliating against an employee.  Furthermore, Plaintiff has not pointed to any applicable law which says that an attorney should be viewed with more suspicion in a Title VII claim.

Next, Plaintiff emphasizes the sudden change in Jones' behavior after he rejected her sexual advances.  However, the sudden change in behavior was not caused by Plaintiff's protected activity (i.e. her complaint).[4]  When she complained to Anne Connor, Jones had already been rude to her for nearly a

---

[4] Plaintiff does not specifically argue that resisting Jones sexual advances constitutes a protected activity.  There is an open question in this Circuit regarding whether resisting a sexual advance is a protected activity for purposes of a retaliation claim.  See Murray v. Chicago Transit Auth., 252 F.3d 880, 890 (7th Cir. 2001)(expressly declining to resolve the issue).  Since neither party has addressed this question in their briefs, the Court will not tackle this unresolved issue.

year and half.  Immediately after she complained, his behavior
did not get worse, but instead it improved for several months.
(Doc. 13 at ¶ 66.)  Accordingly, the change in Jones' behavior
does not support an inference that the cause of his behavior was
her protected activity.  Instead the evidence supports an
inference that his behavior is what is to be expected from the
rude, egotistical and overbearing picture Plaintiff paints of
Jones.  See Berry v. Delta Airlines, Inc., 260 F.3d 803, 808
(7th Cir. 2001)(noting that Title VII "is not 'a general
civility code' designed to purge the workplace of all boorish
[behavior]," but is instead a statute designed to protect
against workplace discrimination caused by some protected
status).

Plaintiff also emphasizes Jones' influence over her
ultimate termination.  Specifically, Plaintiff emphasizes the
suspicious timing between her disagreement over firing Angela
Nunn and her ultimate termination.  However, Plaintiff does not
sufficiently demonstrate that the disagreement over Nunn was a
pretext for her actual termination.  This evidence only supports
an inference that Jones pushed for her termination because he
disagreed with firing Angela Nunn, not that he had a retaliatory
intent from an incident years earlier.  Pretext does not mean
that an employer made a poor business decision or even a
mistake, it means a lie or a phony excuse.  Hudson v. Chicago

Transit Authority, 375 F.3d 552 (7th Cir. 2004).  Even if
Plaintiff was fired because of the disagreement over Nunn, the
fact that Nunn was rehired and later terminated does not mean
that the disagreement was a lie or a phony excuse.  At best, it
was a poor business decision or a mistake.  Absent additional
evidence, the disagreement over Nunn does not tie Plaintiff's
protected activity to her ultimate termination.

     Finally, all that is left is Plaintiff's allegation that
she was told by Flannery at various times that Jones was looking
for a reason to fire her because of her complaints against him.
(Doc. 13 at ¶ 74.)  While neither side makes the argument, this
statement is rank hearsay: it is not made by the declarant (it
is made by Plaintiff instead of Flannery), and it is offered to
prove the truth of the matter asserted (to prove that Jones was
indeed looking for a reason to fire her).  Furthermore, it does
not fit within any of the exceptions to the Hearsay Rule.  See
Fed.R.Civ.Evid. 801-803.  Hearsay evidence is inadmissible in
summary judgment proceedings to the same extent that it is
inadmissible at trial.  Eisenstadt v. Centel Corp., 113 F.3d
738, 742 (7th Cir. 1997).  As a result, this hearsay cannot
provide the required link between Plaintiff's protected activity
and her ultimate termination.

     Accordingly, the circumstantial evidence that Plaintiff
brings before the Court is not enough to allow a reasonable jury

to find that Plaintiff's protected activity caused her termination.  <u>See</u> <u>Paluck</u>, 221 F.3d 1003, 1010 (7th Cir. 2000)(holding that a plaintiff could not survive summary judgment when she combined limited circumstantial evidence with a one year gap in between her complaint and termination).

<b>CONCLUSION</b>

IT IS THEREFORE ORDERED that Defendant's Motion for Summary [Doc. 11] Judgment is GRANTED.

CASE TERMINATED

ENTERED this  <u>5th</u>  day of June, 2007.

<u>   s/ Joe Billy McDade_____</u><br>
Joe Billy McDade<br>
United States District Judge